UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

MICHAEL PREMO,

                              Plaintiff,

        -v-

THE CITY OF NEW YORK, New York City Police
Department ("NYPD") SERGEANT RICHARD
JONES (Shield No. 4142), NYPD DETECTIVE
TREVOR BOSCO in their individual and official
capacities,

                              Defendants.

—————————————————————

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

13 CV 8141 (WHP)

MICHAEL PREMO, by his attorneys REBECCA HEINEGG of the Law Office of

Maurus and Heinegg, as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1.  This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and
    Fourteenth Amendments of the Constitution of the United States, through the Civil Rights
    Act of 1871, *as amended*, codified as 42 U.S.C. § 1983; and pendant claims under the
    Constitution of the State of New York, Article I, §§ 6, 11, and 12, and the laws of the State
    of New York.

2.  Plaintiff MICHAEL PREMO's rights were violated when officers of the New York City
    Police Department ("NYPD") unconstitutionally and without any legal basis seized,
    detained, and arrested him. Plaintiff's rights were further violated when he was subjected to
    excessive force and excessively and unreasonably prolonged, unnecessary, and punitive
    detention.

3.  By reason of defendants' actions, Mr. PREMO was deprived of his constitutional rights.

1

4. Mr. PREMO seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

5. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth, and Fourteenth Amendments of the Constitution of the United States.

6. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

7. This Court has supplemental jurisdiction over plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

8. Pursuant to New York State General Municipal Law § 50-E, plaintiff filed a timely Notice of Claim with the New York City Comptroller on or about March 8, 2013. Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

9. Venue is proper pursuant to 28 U.S.C. §1391(b) in that plaintiff's claims arose in the Southern District of New York.

10. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

11. Plaintiff MICHAEL PREMO is an African-American male, and at all times relevant to this action was a resident of Kings County, New York.

12. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is

ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers.

13. Defendants NYPD SERGEANT RICHARD JONES and DETECTIVE TREVOR BOSCO ("individual defendants") were at all times relevant herein officers, employees and agents of the NYPD. At all times relevant to this action, the individual defendants were acting under color of state law as agents, servants, employees and officers of the NYPD. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD.

14. The individual defendants are being sued in their individual and official capacities.

15. Defendants' acts herein complained of were carried out intentionally, recklessly, and with malice and gross disregard for plaintiff's rights.

## STATEMENT OF FACTS

16. The incident alleged herein occurred at approximately 6:00 p.m. on December 17, 2011 in the vicinity of 29th Street and 7th Avenue in New York County, and continued thereafter as set forth below.

17. At the time set forth in paragraph 16, Mr. PREMO was lawfully participating in an Occupy Wall Street demonstration.

18. Mr. PREMO was proceeding north-bound up 7th Avenue, on the sidewalk, when a number of NYPD officers blocked the street with orange netting.

19. As Mr. PREMO stood behind the netting, a number of protesters ran through an opening in the netting to one side of Mr. PREMO.

20. In response, members of the NYPD began pushing on the netting and the people behind it, knocking Mr. PREMO over.

21. As Mr. PREMO attempted to get to his feet, defendant RICHARD JONES tackled Mr. PREMO to the ground.

22. Defendant JONES then placed Mr. PREMO under arrest on charges of felony assault.

23. At the time and place set out in the paragraphs above, defendant Detective BOSCO was videotaping the events described herein as part of his assignment to the Technical Assistance and Response Unit (TARU).

24. Mr. PREMO was held at in custody for approximately thirty hours before he was eventually arraigned on felony assault charges and released on $3,500 bail.

25. Mr. PREMO was charged with violations of New York Penal Law § 120.00, Assault in the Third Degree, New York Penal Law § 204.30, Resisting Arrest, and New York Penal Law § 240.20, Disorderly Conduct.

26. In a sworn information, Sergeant RICHARD JONES made the following factual allegations against Mr. PREMO:

> Deponent states that deponent observed the defendant obstructing vehicular traffic by walking in the street at the above-stated-location, and did so while disregarding police orders to stay within a barricaded area. Defendant's conduct created a public disturbance/inconvenience in that it caused disruption of the normal flow of traffic.

> Deponent further states that when deponent was attempting to place defendant under arrest, defendant twisted defendant's body, refused to place defendant's hands behind defendant's back, and pushed deponent with defendant's hands and body, causing deponent to fall twice and causing deponent to suffer a sprained right hand and substantial pain.

27. Defendant JONES made the sworn statement quoted above, on the basis of which Mr. PREMO was arrested and charged, with full knowledge that the statement was false.

28. Although Defendant BOSCO had taken video of the events described herein, he did not turn over this exculpatory evidence to the District Attorney of New York or to Mr. PREMO.

4

29. During the period between December 17, 2011 and February 28 2013, Mr. PREMO was required to make approximately 13 court appearances, including four days of trial, to defend himself in the criminal proceedings that defendants had initiated against him.

30. On February 25, 2013, Defendant JONES testified at trial, in sum and substance, that he had observed Mr. PREMO lift up the orange netting, tackle an NYPD Lieutenant, and then attempt to flee, knocking over two officers three times before he could be restrained.

31. Defendant JONES made the sworn statement referred to above with full knowledge that it was false.

32. On or about February 27, 2013, Defendant BOSCO represented to an Assistant District Attorney and defense counsel for Mr. PREMO that he had not taken any video of Mr. PREMO's arrest.

33. Defendant BOSCO made this representation with full knowledge that it was false.

34. On February 28, 2013, Mr. PREMO was acquitted of all charges at a trial by jury.

35. As a result of this incident, Mr. PREMO suffered physical, psychological and emotional injuries, mental anguish, suffering, lost wages, humiliation and embarrassment.

## FIRST CAUSE OF ACTION
### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

36. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

37. Defendant RICHARD JONES, under color of state law, unlawfully seized and arrested plaintiff.

38. Defendant did not have probable cause to arrest plaintiff, nor was it objectively reasonable for defendant to believe that he did have probable cause to arrest plaintiff.

39. Defendant's decision to arrest plaintiff was not based upon plaintiff's violation of any provision of the penal law.

40. Defendant JONES, acting willfully and maliciously, commenced and continued a false prosecution against plaintiff, and caused him to be prosecuted.

41. Defendant did not have probable cause to commence and continue a criminal proceeding against plaintiff.

42. Plaintiff was unjustifiably deprived of his liberty for at least 30 hours as a result of the false arrest.

43. Plaintiff was also required to make approximately 13 court appearances, including four days of trial, to defend himself against the proceedings initiated against him by defendant JONES.

44. The criminal proceedings were terminated in plaintiff's favor.

45. By the conduct described above, defendant, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities, including, without limitation, deprivation of the following constitutional rights:

    a.  Freedom to engage in protected speech, expression and association;

    b.  Freedom from unreasonable seizures of his person, including but not limited to excessive pre-arraignment detention;

    c.  Freedom from arrest without probable cause;

    d.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

    e.  Freedom from the lodging of false charges against him by police officers;

      f.  Freedom from malicious prosecution by police, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

      g.  The enjoyment of equal protection, privileges and immunities under the laws.

46.  As a result of defendant's deprivation of plaintiff's constitutional rights, plaintiff was deprived of his liberty, suffered bodily injury, pain and suffering, psychological and emotional injury, mental anguish, lost wages, humiliation and embarrassment, costs and expenses, and was otherwise damaged and injured.

**SECOND CAUSE OF ACTION**
**FAILURE TO INTERVENE TO PREVENT VIOLATIONS OF THE FIRST AND FOURTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

47.  Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

48.  Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

49.  Defendant BOSCO was present for the above-described incident and witnessed defendant JONES unlawfully arrest the plaintiff.

50.  Defendant's arrest and use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendant BOSCO failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to false arrest and excessive force by defendant JONES.

51.  The arrest of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant

JONES which defendant BOSCO knew to be false, yet defendant BOSCO failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

52. Defendant BOSCO's violations of plaintiff's constitutional rights by failing to intervene in another defendant's clearly unconstitutional use of force and plaintiff's unconstitutional arrest and prosecution resulted in the injuries and damages set forth above.

### THIRD CAUSE OF ACTION
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

53. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

54. All of the acts and omissions by the individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

55. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

56. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

57. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a.   Unlawful detention of civilians engaged in activity protected by the First Amendment;

   b.   Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas), particularly where such persons are engaged in activity protected by the First Amendment and/or the consent decree in *Black v. Codd*;

   c.   Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony,

       i.   in order to protect themselves or other officers; and/or

       ii.   in order to meet said productivity goals; and/or

       iii.   in order to chill or obstruct persons from engaging in activity protected by the First Amendment;

   d.   Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

   e.   Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

   f.   Retaliating against officers who report police misconduct; and

   g.   Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

58. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

   a.   *Berg v. Kelly*, 12-CV-3391, (TPG) (S.D.N.Y.) (NYPD officers detain approximately 100 "Occupy" demonstrators for two hours against their will on November 30, 2011 inside a pen built of interlocking metal barricades and then release them without charges);

   b.   *Garcia v. Bloomberg*, 11-CV-6957 (JSR) (S.D.N.Y.) (NYPD arrest 700 "Occupy" demonstrators on the Brooklyn Bridge on October 1, 2011, for the simple act of walking on the bridge in what appeared to participants to be an action sanctioned by police present at the time);

   c.   *Treffs v. City of New York*, 12-CV-3030 (HB) (S.D.N.Y.) (legal observer arrested while observing Occupy Wall Street march on January 1, 2012, without probable cause and false complaint sworn out against him);

d.  *Lambert v. City of New York*, 153046-2011 (Sup. Ct., N.Y. Co.) (officers use excessive force against OWS protestor by affixing plastic handcuffs so tightly that it caused nerve damage, despite her repeated requests to the officers that the cuffs be loosened but were not);

e.  *People v. Alicea*, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant indicted for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly shows that the two arrestees had no contact);

f.  *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

g.  *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

h.  *Lotorto v. City of New York*, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

i.  *Long v. City of New York*, 09-CV-6099 (AKH) (S.D.N.Y.); *People v. Pogan,* 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, *to wit*, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

j.  *Taylor-Mickens v. City of New York,* 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issued four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

k. *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

l. *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

m. *Bryant v. City of New York*, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[2]

n. *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[3]

o. *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

---

[1] For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

[2] For a description of this case and ultimate settlement, *see* Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[3] For a description of this case and the nearly $1 million settlement, *see* Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

p.  *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

q.  *Kyne et al v. Wolfowitz et al*, 06-CV-02041 (S.D.N.Y.) (RJS) (protester arrested during the 2004 Republican National Convention; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

r.  *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

s.  *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

t.  *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

u.  *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

v.  *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

w.  *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

x.  *Kunstler v. City of New York*, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiffs' political beliefs);

y.  *Dotson v. City of New York*, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

z.  *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

aa. *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

bb. *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

cc. *Taylor v. City of New York*, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as *Richardson*, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

dd. *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

ee. *Carin v. City of New York*, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place);

ff. *White-Ruiz v. City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

gg. *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

hh. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

ii. *Kaufman v. City of New York*, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

59. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

    a. In 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

    b. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), is the report of a panel led by Hon. J. Milton Mollen of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins.

    c. The Mollen Commission report states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[4]

    d. Upon information and belief, Defendant CITY did not take meaningful steps to eliminate the customs and practices exposed by the Mollen Commission Report.

    e. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying

---

[4] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/
4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[5]

f. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[6] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). From 2002 through 2010, in 92 percent of the substantiated cases referred to the NYPD by the CCRB, the NYPD did not follow the CCRB's recommendation that officers with substantiated claims of misconduct be disciplined with the most serious penalty of charges and specifications.[7] In 2012, the NYPD issued only verbal or written "instructions" to the subject officer in 62 percent of the substantiated complaints referred to them by the CCRB, and declined to take any action whatsoever in 21 percent of such cases.[8]

60. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

---

[5] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[6] In 2012, out 5,760 complaints taken up by the CCRB, the CCRB substantiated only 967 (about 9%). *See*, CCRB annual appendix 2012, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_appendix_2012.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates. In addition, a former employee of the CCRB has reported that there is strong and explicit institutional pressure within the CCRB to keep the number of unsubstantiated cases to a minimum. *See* David Noriega, *The Thin Blue Lie*, The New Inquiry, *available at* http://thenewinquiry.com/essays/the-thin-blue-lie/.

[7] "Diminished Accountability: How Discipline for Police Misconduct is Downgraded by the NYPD," Citizens Union of the City of New York, March 2012, *available at* http://www.citizensunion.org/www/cu/site/hosting/Reports/CUReport_AccountabilityPoliceMisconduct.pdf.

[8] CCRB Annual Report 2012, *available at* http://www.nyc.gov/html/ccrb/downloads/pdf/ccrb_annual_2012.pdf.

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[9]

[…]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[10]

b.   In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[11]

c.   In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[12] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

---

[9]  Mollen Commission Report, p. 36.

[10]  Mollen Commission Report, pp. 40-41.

[11] Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[12] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[13]

d.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[14]

e.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

---

[13] *Id.*

[14] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post. [15]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[16]

f.   In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[17] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[18]

g.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[19]

61.   The existence of the aforesaid unconstitutional customs and practices, **specifically with**

**regard to the practice or custom of discouraging police officers from reporting the**

---

[15] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[16] John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[17] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer.  John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[18] *Id.*

[19] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

**corrupt or unlawful practices of other police officers and of retaliating against officers**

**who report misconduct**, are further evidenced, *inter alia*, by the following:

a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

d.  *Barry v. New York City Police Dep't*, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ("[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report.");

e.  *United States v. Rosario*, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ("[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997.")

62.  The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

63.  The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders

19

and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

64. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs 45, above.

65. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

66. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

67. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs,

or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

68. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

69. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

70. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

71. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

### FOURTH CAUSE OF ACTION
### MALICIOUS PROSECUTION
### UNDER THE LAWS OF THE STATE OF NEW YORK

72. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

73. Defendant JONES misrepresented and falsified evidence before the District Attorney of New York County ("DANY").

74. Defendant did not make a complete and full statement of facts to DANY.

75. Defendant was directly and actively involved in the initiation of criminal proceedings against plaintiff.

76. Defendant lacked probable cause to initiate criminal proceedings against plaintiff.

77. Defendant acted with malice in initiating criminal proceedings against plaintiff.

78. Defendant was directly and actively involved in the continuation of criminal proceedings against plaintiff.

79. Defendant lacked probable cause to continue criminal proceedings against plaintiff.

80. Defendant acted with malice in continuing criminal proceedings against plaintiff.

81. Defendant misrepresented and falsified evidence throughout all phases of the criminal proceedings.

82. Notwithstanding defendant's misconduct, the criminal proceedings against plaintiff were favorably terminated on the merits.

83. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## FIFTH CAUSE OF ACTION
## RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK
## FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK

84. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85. The conduct of the individual defendants alleged herein occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

86. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## SIXTH CAUSE OF ACTION
## NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING
## UNDER THE LAWS OF THE STATE OF NEW YORK

87. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

88. Defendant CITY negligently hired, screened, retained, supervised, and trained defendants. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

89. As a result of the foregoing, plaintiff suffered injuries and damages as set forth above.

## JURY DEMAND

90. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.  That he be compensated for violations of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.  That he be awarded punitive damages against the individual defendants; and

c.  That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.  For such other further and different relief as to the Court may seem just and proper.

Dated:        New York, New York
              November 14, 2013

                                        Respectfully submitted,


                              By:       _____
                                        Rebecca Heinegg
                                        Maurus & Heinegg
                                        *Attorneys for the Plaintiff*
                                        48 Wall Street, 11th Floor
                                        New York, New York 10005
                                        t: (212) 227-2303
                                        f: (212) 320-0230